IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PTTSBURGH, PA., | : : : | |
| | : | Case No. 2:23-cv-3696 |
| Plaintiff, | : | |
| | : | Judge Algenon L. Marbley |
| v. | : | |
| | : | Magistrate Judge Chelsea M. Vascura |
| TT CLUB MUTUAL INSURANCE LTD., | : | |
| | : | |
| Defendant. | : | |
| | | |
| TT CLUB MUTUAL INSURANCE LTD., | : | |
| | : | |
| Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED SPECIALTY INSURANCE COMPANY, | : : | |
| | : | |
| Third-Party Defendant. | : | |

**Opinion & Order**

This matter is before the Court on Cross-Motions for Summary Judgment between Third-Party Plaintiff, Counter Claimant, and Defendant TT Club Mutual Insurance LTD. ("TT Club") (ECF No. 63), and Plaintiff National Union Fire Insurance Company of Pittsburgh, PA. ("National Union") (ECF No. 65). Additionally, before this Court are Third-Party Defendant United Specialty Insurance Company's ("USIC") Motion for Summary Judgment (ECF No. 60) and Motion to Certify a Question of State Law to the Supreme Court of Ohio. (ECF No. 88). Plaintiff National Union has also filed a Motion to Strike (ECF No. 73).

For the following reasons, this Court **GRANTS** USIC's Motion for Summary Judgment (ECF No. 60) and **DENIES** National Union's Motion for Summary Judgment (ECF No. 65). TT

1

Club's First Amended Counterclaim for Reimbursement of Defense Costs as to the MCL Policy is **DENIED without prejudice** and **DENIED with prejudice** as to the CGL Policy (ECF No. 63). Finally, National Union's Motion to Strike (ECF No. 73) is **DENIED as moot**.

## I.  BACKGROUND

This case is all about the obligations of three insurance companies. National Union, TT Club, and USIC are insurers who provided coverage to Greatwide Dallis Mavis LLC ("Greatwide"), a company offering both broker and motor carrier services. (ECF No. 27 at 14–16). Greatwide was responsible for transporting a load of steel from Illinois to Ohio, when the truck hauling the steel load collided with a passenger vehicle, resulting in death of one passenger and severely injuring another. (ECF No. 1 at 2). Greatwide was sued for liability resulting from that collision in the Franklin County Court of Common Pleas. *Moyer et al. v. Simbad LLC*, Case No. 19-cv-007808 ("*Moyer* Lawsuit"). (*Id.*). That case settled, and now the insurance companies dispute who had the responsibility to defend Greatwide in the *Moyer* Lawsuit and contribute to Greatwide's global settlement payment.

These insurers' obligations derive from a series of insurance policies issued to Greatwide and implicated here. National Union issued two policies: the Motor Carrier Liability Policy and the Commercial General Liability Policy. TT Club issued one policy: the TT Club Transporter Operator Policy. USIC also issued one policy: the United Specialty Insurance Company Commercial Excess Liability Policy.

Plaintiff National Union initially brought this suit against Defendant TT Club, seeking declaratory relief establishing the limitations, rights, and obligations, if any, under National Union's Motor Carrier Liability Policy related to the *Moyer* Settlement and Lawsuit. (ECF No. 1 at 6). National Union contends its Motor Carrier Liability Policy is excess to TT Club's Policy,

and accordingly it is entitled to recovery of its settlement contribution via equitable subrogation or equitable indemnification. (*Id.* at 6–7). In response, TT Club filed a counterclaim against National Union, seeking indemnification of the defense costs it incurred to defend Greatwide, indemnification of its settlement contribution, and a declaratory judgment establishing the rights and obligations under the National Union policies and the TT Club Policy. (ECF No. 27 at 21–26). Additionally, TT Club, as a Third-Party Plaintiff, then joined USIC, another insurer of Greatwide, to the suit and filed a third-party complaint alleging that they also should have contributed to the *Moyer* Settlement, and that TT Club is entitled to indemnification from them, too. (ECF No. 14).

### A.  Factual Background

#### 1.  *The Moyer Lawsuit*

In the underlying lawsuit, Greatwide, a truckload management company, entered a contract with Alton Steel, Inc. to haul a shipment from Alton, Illinois to Painesville, Ohio. (ECF No. 1 at 2). Greatwide subsequently assigned the load to Simbad LLC. (*Id.*). During transport of the shipment on March 26, 2019, a tractor-trailer driven by Simbad employee Bakhadir Kuzikov crashed into the back of a car, seriously injuring the driver, Sarah Popovich, and killing her passenger, Charlotte Finck. (*Id.*). On September 26, 2019, Sarah Popovich, Charles Popovich, and Stephen Moyer, administrator of the estate of Charlotte Finck, ("Underlying Plaintiffs") initiated the *Moyer* Lawsuit against Greatwide, Simbad, and Kuzikov in the Franklin County Court of Common Pleas. (*Id.*). The Underlying Plaintiffs contended that Greatwide knew that Simbad and its drivers were unsafe and alleged negligence, negligence per se, recklessness, and loss of consortium against Greatwide. (*Id.*).

Defendant TT Club agreed to defend Greatwide in the *Moyer* Lawsuit subject to a reservation of rights. (*Id.* at 5). Similarly, National Union informed Greatwide that it would handle

the *Moyer* Lawsuit subject to a reservation of rights under the National Union Policy but specified that its Policy was in excess to the TT Club Policy, and that National Union was not presently obligated to respond to the *Moyer* Lawsuit. (*Id.*). National Union also states that on June 20, 2022, it informed TT Club of these views by letter. (*Id.*).

In response, TT Club disputed that its coverage was primary to the coverage provided under the National Union Policy. (*Id.*). Ultimately, however, National Union and TT Club agreed to participate on a 50/50 basis to resolve all claims against Greatwide while still reserving their individual rights to seek recovery from each other. (*Id.* at 6). Accordingly, on July 1, 2022, the *Moyer* Lawsuit reached a global settlement.[1] (*Id.*). TT Club funded the entirety of Greatwide' s legal defense and paid $291,605.81 in legal fees in addition to its 50% contribution to the settlement in the *Moyer* Lawsuit. (ECF No. 27 at 21).

Due to the settling of the *Moyer* Lawsuit, underlying issues of liability such as whether Greatwide was liable as a motor carrier or as a broker of the Alton Steel load were never determined. (*Id.* at 15). Thus, the Parties heavily dispute Greatwide's true role in the *Moyer* collision, as such is outcome determinative of the insurers' contribution obligations in this current case.

### 2. The Insurance Policies

There are four insurance policies at issue in this case: (1) the National Union Motor Carrier Liability Policy (Policy No. 358-47-03) covering the policy period of June 28, 2018 to June 28, 2019 with a $2,000,000 per accident limit ("National Union MCL Policy"); (2) the National Union Commercial General Liability Policy (Policy No. 192-99-80) covering the policy period of June 28, 2018 to June 28, 2019 with a $1,000,000 per occurrence limit  ("National Union CGL Policy");

---

[1] The parties have filed portions of the cross-motions under seal. Thus, this Court will not reference the exact amount of the Moyer Settlement.

4

(3) the TT Club Transporter Operator Policy (Policy No. 8227/1207/002) for the period of October 30, 2017 to June 28, 2019 with a $5,000,000 per accident limit ("TT Club Policy"); and (4) the United Specialty Insurance Company Commercial Excess Liability Policy (Policy No. USA 4217952) covering the period from June 28, 2018 through June 28, 2019 with a $5,000,000 each occurrence limit ("USIC Policy"). (ECF Nos. 1-1, Exhibit A, at 2–4, Exhibit B, at 102–103; 64-1, Exhibit B, at 34–35).

### a)  National Union MCL Policy

First, the National Union MCL Policy coverage provision provided that National Union would "pay all sums [Greatwide] legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." (ECF No. 1-1, Exhibit B, at 123). "Auto" is defined as:

> a. A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or
> b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

(*Id.* at 133). Additionally, the National Union MCL Policy contained a section governing "Other Insurance – Primary And Excess Insurance Provisions," which provided, in relevant part:

> e. Except as provided in paragraphs a., b., c. and d. above, this Coverage Form provided primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

(*Id.* at 132).

### b)  National Union CGL Policy

In addition to the MCL Policy, National Union insured Greatwide under a Commercial General Liability Policy ("CGL Policy"). (ECF No. 27 at 17). The CGL Policy provided that National Union will "pay those sums that [Greatwide] becomes legally obligated to pay as

5

damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. (ECF No. 64-1, Exhibit B, at 48). Additionally, the CGL contained an "Aircraft, Auto or Watercraft" exclusion that bars coverage for "'[b]odily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured." (*Id.* at 51). Finally, the CGL Policy provided an "Other Insurance" clause providing that "[t]his insurance is excess over…[a]ny of the other insurance, whether primary, excess, contingent or on any other basis…[i]f the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft to the extent not subject to" the Aircraft, Auto or Watercraft exclusion. (*Id.* at 59).

### c) *TT Club Policy*

Next, Greatwide maintained a transportation broker liability policy with TT Club which provided "we insure you for liabilities arising from your service as a transportation broker where such service includes the arrangement for the transportation of cargo on a public road in the USA or Canada by a motor carrier which you hire." (ECF No. 1-1, Exhibit A, at 6). The Policy further stated in relevant part:

**T3 THIRD PARTY LIABILITIES**

**1 We insure you for your liability:**
1.1. for the following, including resulting consequential loss:
1.1.1 physical loss/damage to third party property
1.1.2 death, injury or illness of any third party
…
**2 We do *not* insure you under this Clause for liabilities:**
…

2.2 arising from the ownership, lease or operation by you/your employee of a road vehicle which is required to be licensed.

…

**G2 GENERAL TERMS**

…

**18 Double Insurance**

If we and another insurer insure you for the same risk, we will exclude any claim to the extent that it is recoverable from the other insurer, or would be recoverable except for a double insurance exclusion.

…

**G5 DEFINITIONS**

...

**Death, injury or illness**

Includes hospital, medical and funeral expenses

….

**Third party**

Anyone other than us, the assured or a joint assured (or co-assured)

…

**Third party property**

any property of a third party except:

• cargo

• property leased to the assured or a joint assured (for example: equipment, land or buildings)

(ECF No. 1-1, Exhibit A, at 14).

### d)  USIC Excess Policy

Finally, Greatwide maintained an excess policy with USIC which provided umbrella liability coverage for liabilities excess to the National Union CGL Policy. (ECF No. 60 at 7). The USIC Excess Policy provided that "[t]he insurance provided under this Coverage Part will follow the same provisions, exclusions and limitations that are contained in the applicable 'controlling underlying insurance', unless otherwise directed by this insurance." (ECF No. 29-1 at 10). The "Controlling Underlying Insurance Schedule" listed the National Union CGL Policy. (*Id.* at 3). As such, the USIC Policy only provided coverage in excess of the CGL Policy's "retained limit" of $1,000,000 per occurrence. (*Id.* at 10). The USIC Policy also contained an "Automobile Liability" exclusion that preluded coverage for "'Injury or damage' caused by an 'occurrence' and arising

7

out of the ownership, maintenance, use or entrustment to others of any 'auto' owned or operated by or rented or loaned to any insured." (*Id.* at 36).

Notably, the USIC Policy also contained a "Conditions" section providing in relevant part:

**3. Duties in the Event of Occurrence, Offense, Claim or Suit.**
a. You must see to it that we are notified immediately of an "event", regardless of the amount, which may result in a claim under this insurance.
However, if you notify any "controlling underlying insurer" of an "event" involving "bodily injury", it is a precondition of coverage, under this policy that you notify us in writing within 14 days of notifying the "controlling underlying insurer".
\*\*\*
Your failure to provide the written notice, identified above, within the 14 days will be deemed to have prejudiced the Company and voids all coverage of an "event", claim or suit.
\*\*\*
d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.
\*\*\*
**8. Other Insurance**
If other valid insurance, whether collectible or not, is available to the insured for a loss we cover, our obligations are limited as follows:
> a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.
\*\*\*

(*Id.* at 12–13).

### 3. *National Union Sues TT Club Seeking Recovery of National Union's Moyer Settlement Contribution*

On November 3, 2023, National Union initiated the instant lawsuit against TT Club seeking to recover its entire settlement contribution from TT Club. (ECF No. 1). National Union contends that its MCL Policy, by the terms of its "Other Insurance" clause, is excess to the TT Club Policy,

and accordingly National Union is entitled to a declaratory judgment and equitable subrogation or indemnification of its settlement contribution. (*Id.* at 6–8).

### 4.  *TT Club's Contentions and Counterclaim*

In TT Club's view, it shared a duty with National Union to defend and indemnify Greatwide related to the *Moyer* Lawsuit under both their MCL and CGL Policies. (ECF No. 27 at 12). At the time that TT Club contributed to the *Moyer* Settlement, TT Club was entirely unaware of the National Union CGL Policy, which TT Club contends was triggered by the *Moyer* accident in addition to the MCL Policy. (*Id.* at 13). Accordingly, TT Club seeks to recover 1/2 of the legal fees it incurred to defend Greatwide under the MCL Policy, or alternatively, 2/3 of the legal fees it incurred if this Court determines the CGL Policy was also implicated. (*Id.*). Additionally, TT Club argues that the "Other Insurance Provisions" in both National Union Policies are inapplicable to TT Club because the policies cover different risks; however, if applicable, such provisions would render TT Club an excess insurer. (*Id.* at 19–20). In the alternative, TT Club contends the policies are at least mutually repugnant, meaning all three policies should have contributed on an equal basis, with National Union contributing two thirds of the settlement funds and TT Club contributing one-third. (*Id.*). As such, TT Club also contends it is entitled to equitable contribution, subrogation, or indemnification against National Union for its settlement contribution. (*Id.* at 13).

TT Club also joined USIC in this litigation, noting that at the time of the *Moyer* Lawsuit, TT Club was entirely unaware of the USIC Excess Policy. (ECF No. 14 at 2). TT Club contends that National Union should have contributed to the settlement under its CGL Policy, and upon exhaustion of the CGL Policy, USIC should have contributed funds under its Policy. (*Id.*). As such, TT Club filed a third-party complaint seeking equitable contribution, subrogation, or indemnification against USIC. (*Id.*).

9

### 5. USIC's Contentions

USIC denies that it has any defense or indemnity obligations related to the *Moyer* Lawsuit because no one "tendered to USIC, provided notice to USIC or sought the consent of USIC prior to the settlement of *Moyer* Litigation." (ECF No. 29 at 13). USIC notes that it never received notice of the *Moyer* Lawsuit until this current litigation. (*Id.*). In its counterclaim USIC seeks declaratory relief providing the rights and responsibilities under its Policy as well as a declaration that TT Club cannot recover from USIC because the USIC Policy was not triggered and TT Club/Greatwide failed to provide notice or to seek consent prior to the *Moyer* Settlement. (*Id.* at 12–17).

### B. Procedural Background

On May 12, 2025, USIC filed its Motion for Summary Judgment against Defendant TT Club (ECF No. 60). TT Club then filed its Motion for Summary Judgment against National Union and, additionally, sought summary judgment on Count I of TT Club's First Amended Complaint (ECF No. 63). Finally, on May 19, 2025, National Union filed its Motion for Summary Judgment against TT Club (ECF No. 65). All parties filed their opposition motions to the motions for summary judgment. (ECF Nos. 74, 75, 76).

On June 11, 2025, National Union filed a Motion to Strike the Expert Reports of Jeffrey Stempel and Nigel Cooper cited in TT Club's Motion for Summary Judgment. (ECF No. 73). TT Club opposed the Motion (ECF No. 86).

Additionally, after summary judgment briefing concluded, USIC filed a Motion to Certify a Question of State Law to the Supreme Court of Ohio (ECF No. 88), concerning whether "a prejudice analysis [is] required to determine whether a liability insurer must indemnify its insured for a settlement where: (1) the insurer did not have notice or a tender of the lawsuit or claim against the insured until after the settlement; and (2) the insurer's policy includes the following standard

10

policy language: 'No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.'" (*Id.*). TT Club opposed the Motion to Certify. (ECF No. 90).

All motions are now ripe for this Court's review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). In reviewing cross-motions for summary judgment,

11

courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad.*, 929 F.2d at 248 (citing *John v. State of La.* (*Bd. of Tr. for State Colleges & Univ.*), 757 F.2d 698, 705 (5th Cir. 1985)).

### III.    LAW AND ANALYSIS

### A.  Applicable Law

As a federal court exercising diversity jurisdiction, this Court will apply the law of the forum state, Ohio. *Stuckey v. Online Res. Corp.*, 2012 WL 468510, at *6, n.2 (S.D. Ohio Feb. 13, 2012). Accordingly, when there is dispute between parties as to which law applies, this Court "appl[ies] the choice of law principles of the forum State, here Ohio." *Sims Buick-GMC Truck, Inc. v. Gen. Motors LLC*, 876 F.3d 182, 185 (6th Cir. 2017) (citation omitted). Under Ohio law, "[i]f the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law." *Mecanique C.N.C., Inc. v. Durr Env't, Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004) (Marbley, J.).

Here, the parties do not address overtly which law governs the policies, although, in a majority of the arguments asserted, the parties rely on Ohio law. National Union recognizes that while the policies were issued in Pennsylvania, the underlying accident occurred in Ohio, and there is no conflict between the two jurisdictions. TT Club, however, makes a couple of arguments in which they suggest Pennsylvania or English law may govern. Accordingly, as to issues when the parties raise no conflict this Court applies Ohio law. Alternatively, as to the issues where TT Club

asserts the law of another jurisdiction should apply, this Court will conduct an analysis pursuant to Ohio's choice of law rules.

### B. National Union and TT Club's Cross Motions for Summary Judgment

First, this Court will address the cross motions for summary judgment between National Union and TT Club. National Union seeks summary judgment on all three counts of its Complaint: (1) Declaratory Judgment; (2) Equitable Subrogation; and (3) Equitable Indemnification. (*See* ECF Nos. 65-1 at 24; 1 at 6–7). In its Cross-Motion, TT Club seeks summary judgment on all three of National Union's claims. (ECF No. 64 at 6). Additionally, TT Club seeks summary judgment as to Count I of its First Amended Counterclaim for equitable contribution, subrogation, or indemnification from National Union for the $291,605.81 in defense costs that TT Club paid in the *Moyer* Lawsuit. (*Id.* at 33; *see also* ECF No. 27 at 22).

To resolve these cross-motions, this Court must determine: (1) whether Greatwide acted a motor carrier or a broker when it engaged Simbad to transport the Alton Steel load; (2) whether both the National Union MCL Policy and the TT Club Policy covered Greatwide for its alleged broker liability; (3) whether National Union's CGL Policy applies at all; (4) whether the "Other Insurance" clauses in National Union's CGL and MCL Policies apply; (5) whether TT Club's "Double Insurance" clause is an excess clause or an escape clause; and (6) whether National Union breached its duty to defend Greatwide.

### 1. Greatwide's Role in the Underlying Accident

In the *Moyer* Lawsuit, the Underlying Plaintiffs alleged that Greatwide was the motor carrier of the Alton Steel load but alleged in the alternative that Greatwide was the broker of the load. (ECF No. 65-1 at 6). Given the settlement in that case, however, Greatwide was never assigned ultimate liability as a broker or a motor carrier. (*Id.*). In the present lawsuit, the parties

13

dispute which insurer had a duty to defend Greatwide, and which insurer was ultimately liable for the *Moyer* Settlement. As such, this Court must first determine Greatwide's role in the underlying accident before it can rule. Moreover, if this Court cannot determine based on the record whether Greatwide acted as a motor carrier or a broker, this Court cannot determine indemnification obligations and summary judgment may be inappropriate. *See Universal Med. Systems, Inc. v. C.H. Robinson Worldwide, Inc.,* 2013 WL 12138550, at *3–4 (N.D. Ohio Feb. 6, 2013) (finding summary judgment for claims under the Carmack Amendment inappropriate where there was a genuine issue of fact as to a company's role as a broker versus a motor carrier); *see also Maxum Indem. Co. v. Selective Ins. Co. of S.C.*, 2012-Ohio-2115, ¶ 23 (9th Dist.) (finding summary judgment for defense costs and indemnification of a settlement between insurers inappropriate where there was a genuine question of material fact as to whether the mutually insured's underlying conduct arose from professional liability versus business liability); *Lexington Ins. Co. v. DunnWell, LLC*, 2016-Ohio-5311, ¶ 48 (9th Dist.) ("While the duty to defend arises when the allegations in the complaint arguably fall within the policy's coverage, 'the duty to indemnify, on the other hand, arises **only if liability in fact exists** under the policy.'… Before the trial court can determine whether an insurance company has the duty to indemnify an insured, **it must have proof of the facts** underlying the complaint.") (citations omitted) (emphasis added).

Generally, a broker coordinates the transportation of freight and cargo on behalf of its customers whereas the motor carrier transports the load from Point A to Point B via a motor vehicle. *See* 49 U.S.C. §§ 13102(2),(14),(16); *Cox v. Total Quality Logistics, Inc.*, 142 F.4th 847, 856 (6th Cir. 2025) ("The [ Federal Aviation Administration and Authorization Act] defines 'broker' as any 'person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation,

14

advertisement, or otherwise as selling, providing, or arranging for, *transportation by motor carrier* for compensation … And it defines 'motor carrier' as any 'person providing *motor vehicle transportation* for compensation.' ... Thus, the Act recognizes that brokers are entities that work with motor carriers to sell, provide, and arrange for transportation via motor vehicles."); *Total Quality Logistics, L.L.C. v. JK & R Express*, *L.L.C.*, 2022-Ohio-3969, ¶ 2 (12th Dist.) (noting TQL is a broker that arranges for the transportation of its customers' freight and cargo whereas JK & R is a motor carrier that transports the cargo). In some instances, however, where a motor carrier that was authorized and legally bound to transport a load itself assigns the load to a third party, that motor carrier may still be deemed a motor carrier despite acting as a broker. *See Diamond Trans. Logistics, Inc. v. Kroger Co.*, 649 F. Supp. 3d 608, 630 (S.D. Ohio 2023) (citing 49 C.F.R. § 371.2(a)); *see also Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1302 (11th Cir. 2018)("In any case, the operative inquiry is this: pursuant to the parties' agreement, with whom did the shipper entrust the cargo?"). As such, courts must analyze any written agreements between the shipper and the company agreeing to transport the load before making a determination as to the company's role as a motor carrier or a broker.

Neither a company's licensing status as a broker or a motor carrier, nor is its stated purpose inherently dispositive; rather, courts will look to how the company held itself out in business generally and specifically with the shipper. *Universal Med. Systems, Inc.*, 2013 WL 12138550, at *3; *Sci. Bridge, LLC v. W & W Trucking, LLC*, 2025 WL 703864, at *4 (N.D. Ohio Mar. 5, 2025) ("[W]hether a company is a freight forwarder is determined by how it represents itself to the world and its relationship to the shipper. Further, the Court must look to the services provided under the contract. The relevant contract is the one between Scientific and Sunteck, not Sunteck and [the

15

third-party].")[2]; *see also Essex*, 885 F.3d at 1302 ("Where no [contract] exists, the question will depend on how the party held itself out to the world, the nature of the party's communications and prior dealings with the shipper, and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question".)

Further, federal case law supports that the determination between a broker and motor carrier is a case-by-case analysis that is "inherently fact-intensive and not well suited to summary judgment." *Universal Med. Systems, Inc.*, 2013 WL 12138550, at *3 (citing *Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011); *see also Essex*, 885 F.3d 1292 at 1302 (finding that the lower court's summary judgment determination inappropriate where there was a genuine issue of material fact as to whether the company accepted legal responsibility to transport the load or communicated to the shipper that it was brokering the shipment to a third party.).

### a) *National Union's Argument as to Greatwide's Role*

In its Motion for Summary Judgment, National Union contends that Greatwide, Greatwide's defense counsel, and Greatwide's expert all agree that Greatwide acted as the broker of the load. (EFC No. 65-1 at 6–10). As support, National Union cites various email exchanges arising out of the underlying *Moyer* lawsuit as support that Greatwide's General Counsel, Matt Bates, believed Greatwide acted as a broker and that such belief conflicted with TT Club's beliefs. (*Id*. at 7). National Union also argues that Robert Boroff, defense counsel retained by TT club to defend Greatwide, ultimately stated that Greatwide acted as a broker, but that there was still a 50%

---

[2] This Court notes that while a freight forwarder and a motor carrier are not the same, the analysis in *Scientific Bridge* is relevant given freight forwarders may act as a carriers. *See Transp. Revenue Management, Inc. v. First NH Inv. Services Corp.*, 886 F. Supp. 884 n.2 (D.D.C. 1995). Additionally, the Northern District of Ohio conducted the same analysis that federal courts use to analyze whether an entity is a broker or motor carrier to assess the entity at issue in *Scientific Bridge*.

chance a jury would find Greatwide liable as a motor carrier out of confusion or anger. (*Id.* at 7–8). Additionally, National Union contends that the expert report of Anette Sandberg, former administrator of the Federal Motor Carrier Safety Administration ("FMCSA"), establishes that Greatwide acted as a broker. (*Id.* at 9). Sandberg was initially retained by TT Club to assess Greatwide's status as a broker versus as a motor carrier, because of the settlement, however, Sandberg did not complete her report for the underlying *Moyer* action. (*Id.*). National Union has since retained Sandberg to complete her assessment for the current litigation. (*Id.*). In both her report and deposition, Sandberg opined, based on her professional experience as the former Administrator of the FMCSA, that given Simbad, not Greatwide, bound itself to the load and assigned the driver, Greatwide was the broker and not the motor carrier. (*Id.*). Ultimately, however, National Union contends that it does not have to prove whether Greatwide acted as a broker of the Alton Steel load to be entitled to indemnification. (ECF No. 84 at 4). In National Union's view, given that its recoupment claim is based on its "Other Insurance" clause arguments, it believes its policy is excess to the TT Club Policy regardless of any finding of liability as a motor carrier or a broker. (*Id.*).

### b) *TT Club's Argument as to Greatwide's Role*

TT Club argues that Greatwide's status as a broker or a motor carrier involves disputed issues of fact that should preclude summary judgment on the issue. (ECF No. 75 at 9). As support for its arguments, TT Club offers its expert, James Wescoe, an attorney experienced in personal injury and wrongful death cases involving motor carriers and brokers. In his report, Wescoe concluded that, given the disputed material facts at play, the *Moyer* action would have gone to a

jury trial rather than being resolved on dispositive motions.[3] (*Id.* at 11). Moreover, Wescoe stated that the *Moyer* evidence supported the Underlying Plaintiffs' theory that Greatwide acted as a motor carrier. (*Id.*). TT Club additionally highlights that the contract between Alton Steel and Greatwide labeled Greatwide as the motor carrier, and that witnesses for Alton Steel acknowledged there was no documentation indicating that Greatwide was permitted to broker loads for Alton Steel. (*Id.* at 11–12). Finally, TT Club contends that the subjective views of Greatwide or the advocacy positions taken by its attorneys in the underlying lawsuit are irrelevant to the actual exposure Greatwide faced. (*Id.*).

### c)  *The Court's Analysis of Greatwide's Role*

After a review of the record, this Court finds that a genuine issue of material fact exists as to whether Greatwide was a motor carrier or a broker in the underlying action. *Universal Med. Systems, Inc.*, 2013 WL 12138550, at *3–4. As a threshold matter, this Court is not persuaded by National Union's citation to communications between Greatwide and the insurers regarding settlement of the underlying lawsuit, as such communications and legal positions do not actually glean insight into Greatwide's role. Instead, this Court must first determine any obligations under the contract between Alton Steel and Greatwide. Notably, however, this Court was not provided the entire Contract Carrier Transportation Service Agreement between Greatwide and Alton Steel. Hence, this Court must rely only on the characterizations of the agreement in each party's expert reports.

On August 8, 2018, Alton Steel and Greatwide entered the relevant Agreement. (ECF No. 61-2, Sandberg Expert Report at 5). The Sandberg Expert Report explains that the Agreement

---

[3] James Wescoe was initially retained by TT Club in the *Moyer* Litigation to provide expert testimony regarding Greatwide's potential liability from the accident involving the Alton Steel load. (ECF No. 70-3 at 2). Wescoe prepared an expert report in this case on December 20, 2024. (*Id.*).

between Alton and Greatwide contained an identical provision to the Contract Carrier Transportation Service Agreement between Alton Steel and CRST, a company that provided Alton Steel a full-time dispatcher/coordinator that handled all Alton Steel shipments. (*Id.*). The Contract Carrier Transportation Service Agreement between Alton Steel and CRST stated "[c]arrier agrees to attempt to meet the special needs of Shipper by providing it with a complete transportation service that is both flexible and reliable." (*Id.*). Sandberg opines that this identical provision supports the fact that Greatwide was authorized to broker loads on behalf of Alton Steel. (*Id.*). The report also notes that nothing in the Contract Carrier Transportation Service Agreement between Greatwide and Alton Steel prohibited Greatwide from brokering loads. (*Id.*). Additionally, CRST and Alton Steel also had a "Letter of Understanding" that allowed CRST to assign to their own trucks first and to "arrange for secondary trucking companies to handle the freight." (*Id.*). The report provides that pursuant to the Letter of Understanding, CRST brokered Alton Steel loads to other motor carriers and also provided other brokers Alton Steel loads who then brokered the loads themselves to a motor carrier. (*Id.*).

As further support that Greatwide acted as a broker, the Sanberg Expert Report cited the deposition of Steve Horton, a representative of CRST sub-contracted by Alton Steel who was responsible for scheduling outbound shipments for Alton Steel. (ECF No. 61-2, Sandberg Expert Report at 7). According to Horton, while Greatwide was listed as a motor carrier in the bill of lading between Greatwide and Alton Steel, it was understood that the company listed as the motor carrier was not necessarily the motor carrier. (*Id.*). Horton provided that he routinely would enter into the comments field of the bill of lading the name of the actual motor carrier so that Alton Steel employees would know who was picking up the load, despite a different name being listed in the bill of lading. (*Id.*). As for this particular load, Horton testified that Simbad was listed in the

19

comments section as the motor carrier. (*Id*. at 8). Such testimony indicates that there may have been an understanding between Alton Steel and Greatwide that Greatwide was brokering the loads despite it appearing otherwise on paper.

Further, Greatwide's corporate representative testified that it provided both broker and motor carrier services to Alton Steel and attested that Greatwide believed it was acting as a broker with respect to the load at issue. (ECF No. 61-2, Exhibit H at 12, 41). Additionally, the Sandberg Expert Report states that since entering into its Agreement with Alton Steel in 2018, Greatwide brokered all Alton Steel loads to other motor carriers. (ECF No. 61-2, Sandberg Expert Report at 10).

On the other hand, TT Club notes that Alton Steel CEO, Jeff Dorries, testified that he was unaware of any agreement with Greatwide that specifically authorized Greatwide to broker loads. (ECF No. 70-3, Wescoe Expert Report at 12). Dorries contended that under the Letter of Understanding, CRST had authority to transport loads themselves or to broker them to another motor carrier. (*Id.*). Notably, once CRST assigned the load to another motor carrier, Alton Steel was to enter into a Contract Carrier Transportation Service Agreement with the motor carrier—such as the one between Greatwide and Alton Steel that was to only apply to transport of loads, not brokering. (*Id.*). Dorries ultimately admitted that while the Agreement did not expressly authorize brokering, it did not expressly prohibit brokering. (*Id.*). Rick Purdy, an agent for CRST, also attested that in his view Greatwide was the motor carrier and the Contract Carrier Transportation Service Agreement between Alton Steel and Greatwide did not apply to brokering loads, but acknowledged there was no specific prohibition. (*Id.*).

Other Alton Steel representatives, such as Mike Cook, testified that Alton Steel paid no attention to the comments section Horton referred to and thus would not have known whether

Greatwide or another carrier picked up the load. (*Id.* at 14). Additionally, CRST corporate designee Timothy Barth attested that he was not aware Greatwide was acting as a broker for any Alton Steel loads. (*Id.*). In sum, such testimony presents a genuine issue of material fact regarding the true nature of the relationship between Greatwide and Alton Steel.

Looking to the expert reports, Sandberg's report concluded that Greatwide's conduct equated to that of a broker, while Wescoe's report focused on Greatwide's potential exposure had the *Moyer* lawsuit gone to trial. Moreover, while Wescoe did not opine explicitly as to what he believed Greatwide's role was in the matter, he declared that Greatwide faced far greater exposure as a motor carrier than a broker, and further that the *Moyer* court would not have ruled as to Greatwide's identity on summary judgment. (ECF No. 61-2, Wescoe Expert Report at 26–27). Although the expert reports are not inherently in conflict given that the Wescoe Report opines on potential exposure and not Greatwide's status as a motor carrier or broker, this Court's job is not to weigh evidence or make credibility determinations between experts. *See Phillips v. Cohen,* 400 F.3d 388, 399 (6th Cir. 2005). Further, case law is clear that the relationship between Greatwide and Alton Steel, the underlying contracts between the two, and how Greatwide held itself out are all relevant to the analysis of determining Greatwide's role. *See Universal Med. Systems, Inc.*, 2013 WL 12138550, at *3; *Sci. Bridge, LLC v. W & W Trucking, LLC*, 2025 WL 703864, at *4 (N.D. Ohio Mar. 5, 2025). Ultimately, however, the testimony of the employees involved as to what was common practice between the parties, in addition to what was understood between the parties with regard to this specific load, brings more questions than answers. *See Universal Med. Systems, Inc.*, 2013 WL 12138550, at *3 (finding a genuine dispute of material fact as to a company's identity where evidence was submitted that lower level employees of the shipper understood the company in question was brokering the load but the shipper contended

21

communications with the company President and the Agreement between the parties indicated the company in question was a broker). Finally, without the relevant contracts in their entirety it is difficult for the Court to determine what Greatwide was legally authorized and bound to do with regard to the Alton Steel load. *Diamond*, 649 F. Supp. 3d at 630 (noting that motor carriers are not brokers when they assign a load they accepted and agreed to transport themselves).

Accordingly, this Court finds that there are genuine issues of material fact regarding Greatwide's role as a broker or motor carrier in the underlying action. Thus, for reasons discussed further below (*see* Section III.B.2, *supra*), this Court finds that the dispute of material fact as to Greatwide's role directly impacts National Union's ability to prove its recoupment claim.

### 2. *Declaratory Judgment*

Next, National Union seeks declaratory relief establishing the limitations, rights, and obligations, if any, under the National Union MCL Policy. (ECF No. 1 at 6). Courts consider five factors in determining whether to declare the rights of litigants: "(1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for a race for res judicata;' (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *United Specialty Ins. Co. v. Cole's Place, Inc.,* 936 F.3d 386, 396 (6th Cir. 2019) (alteration omitted) (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)). Ultimately, however, courts have substantial discretion when granting declaratory relief. *Byler v. Air Methods Corp.*, 823 Fed. App'x 356, 365 (6th Cir. 2020).

Here, declaratory judgment as to the obligations under the policies at play would clarify the legal relations at issue by declaring which insurer(s) would be liable relative to Greatwide's determination as a broker or motor carrier under their respective policies. As such, this Court issuing a declaration of how these policies interact may be outcome determinative of the current controversy. As to the third factor, the liability of Greatwide in the Moyer action was never determined, and the insurance policies will be analyzed against each other for the first time in this current action. Thus, there are no res judicata concerns. As to factor four, there will be no encroachment on state law as this Court will invoke Ohio law to determine how the contracts are to be interpreted. Finally, this Court does not see an alternative or more judicially efficient resolution than to declare the obligations of the policies under the law. As such, this Court will exercise its jurisdiction to declare the rights and obligations under the relevant insurance policies.

Under Ohio law, insurance policies are interpreted by the same rules of construction applicable to other contracts, and words in the policy must be given their plain and customary meaning. See *Walker ex rel. Est. of Walker v. Albers Ins. Agency*, 2019-Ohio-1316, ¶ 20 (1st Dist.); *see also Diamond Trans. Logistics, Inc. v. Kroger Co.*, 649 F. Supp. 3d at 620. Further, while the insured has the burden of demonstrating coverage under the policy and proving a loss, the insurer bears the burden of proving an exclusion. *Schmidt v. Travelers Indem. Co. of Am.*, 101 F. Supp. 3d 768, 776 (S.D. Ohio 2015) (citations omitted). As such, "[e]xclusionary language in insurance policies must be clear and exact." *Id.* (citation omitted).

National Union contends that its MCL Policy is excess to the TT Club Policy. Given that the TT Club Policy covers up to $5,000,000 in liability, National Union argues that its MCL Policy is not implicated in the *Moyer* settlement which is less than the coverage offered under the TT Club Policy. (*Id.*). Neither party disputes that the TT Club Policy covers Greatwide's broker

liability. (ECF No. 65-1 at 10). National Union, however, contends that its MCL Policy covers Greatwide's liability as both a broker and a motor carrier. (*Id.* at 11). TT Club opposes this argument. (ECF No. 64 at 14–19). In TT Club's view, the National Union Policy only covers motor carrier liability, and accordingly the policies cover different risks. (ECF No. 62-1 at 1–5). As such, TT Club contends that National Union's "Other Insurance Clauses" do not apply and the National Union MCL Policy is primary insurance as a matter of law. (*Id.* at 3).

To establish the limitations, rights, and obligations under the National Union MCL Policy, this Court must determine: (1) whether the National Union MCL Policy covered Greatwide for its alleged broker liability in addition to its motor carrier liability; (2) whether if at all National Union's CGL Policy applies; (3) whether the National Union MCL Policy's "Other Insurance" clause applies; (4) whether TT Club's "Double Insurance" clause is an excess clause or an escape clause; and (5) whether National Union had a duty to defend Greatwide.

### a) *Coverage Under the National Union MCL Policy*

The MCL Policy provides that National Union "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a **covered 'auto'**". (ECF No. 65-1 at 11) (emphasis added). Notably, the MCL Policy does not explicitly define "covered auto." The Policy does, however, contain a "Description of Covered Auto Designation Symbols" section which designates the symbol "61" which is defined as "Any 'Auto'" for "Covered Autos Liability." (*Id.*).

National Union relies on the reasoning of the state court of appeals in *Hill v. Stony Ridge Inn S. Ltd.*, to interpret what is deemed a "covered auto" in the MCL Policy. *See* 1997 WL 746058 (12th Dist. Dec. 1, 1997). In *Hill*, the relevant insurance policy contained a nearly identical

24

provision to National Union's MCL Policy.[4] The declarations of the policy in *Hill* specified that "covered autos" included autos falling within "Category 1" of the "Description of Covered Auto Designation Symbols" section.[5] *Hill*, 1997 WL 746058, at * 4. Category 1, like symbol "61" in the MCL Policy, specified that it included "any auto." *Id.* Given that "any auto" was not defined further, the court reasoned that:

> Besides the "any auto" designation [in category 1], the Description of Covered Auto Designation Symbols contains limited categories "2" through "9". These limited categories include autos that are owned, hired, or used by a business.[3] Thus, when the policy is read in its entirety, the term "any auto" logically refers to all autos falling within the subsequent limited categories "2" through "9".

*Id.* at *5. In sum, the *Hill* court reasoned that "any auto" was essentially an umbrella term that captured all other types of autos specified in the section. Applying this same logic, National Union contends that its MCL Policy covers all autos specified in its policy's "Description of Covered Auto Designation Symbols" section, which includes autos not owned by Greatwide that are leased, hired, rented or borrowed and are used in connection with Greatwide's business. (ECF No. 65-1 at 11). The National Union MCL Policy's "Description of Covered Auto Designation Symbols" section provides:

---

[4] In relevant part, the *Hill* Policy provides: "We will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" *Hill*, 1997 WL 746058, at *4.

[5] In relevant part, the *Hill* Policy's Description of Covered Auto Designation Symbols section provides:
SYMBOL DESCRIPTION
1 = ANY "AUTO"
2 = OWNED "AUTOS" ONLY. * * *
3 = OWNED PRIVATE PASSENGER "AUTOS" ONLY. * * *
4 = OWNED "AUTOS" OTHER THAN PRIVATE PASSENGER "AUTOS" ONLY. * * *
5 = OWNED "AUTOS" SUBJECT TO NO-FAULT. * * *
6 = OWNED "AUTOS" SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. * * *
7 = SPECIFICALLY DESCRIBED "AUTOS." * * *
8 = HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your employees or partners or members of their households.
9 = NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or personal affairs.
*Id.* at *5, n.3

**SYMBOLS | DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS**

61 | ANY "AUTO"

62 | OWNED "AUTOS" ONLY. * * *

\*\*\*

68 | HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your employees or partners or members of their households.

\*\*\*

71 | NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your employees or partners or members of their households but only while used in your business or personal affairs.

(ECF No. 1-1 at 122). Further, the MCL Policy's "Schedule of Coverages and Covered Autos" section provides that symbol "61" indicates which autos are included in the "covered autos" liability. (*Id.* at 103). Applying the same logic from *Hill*, when the policy is read in its entirety, the umbrella term "any auto" logically refers to all autos falling within the eleven subsequent symbol descriptions. Given one of the symbols is "71" indicating "Nonowned 'Autos' Only[,]" National Union contends that the Policy covers autos not owned, but used by Greatwide in connection with its business, such as the tractor-trailer owned and operated by Simbad in this case.

TT Club disputes that its Policy and the National Union MCL Policy cover the same risk. (ECF No. 64 at 14–20). TT Club argues its policy covers "risks associated with errors, omissions, or negligence resulting from the insured providing services as a broker – not the risks of transporting or delivering goods, which are auto liability risks." (*Id.* at 15). Further, TT Club contends that National Union conflates loss with risk, and that risk and loss are distinct. (*Id.* at 16) (citing *Gull Indus., Inc. v. Granite State Ins. Co.*, 493 P.3d 1183 (Wash. App. 2021)). In TT Club's view, just because the policies may cover the same loss of the *Moyer* accident, does not mean the policies cover the same risk of "professional negligence in providing transportation broker

26

services." (*Id.* at 18). TT Club further contends that even if the policies both cover the risk of broker liability, the risk is not the same, as it pertains to motor carrier liability. (*Id.* at 21).

Notably, TT Club makes no comment as to National Union's reliance on *Hill* to ascertain its interpretation of the term "covered auto." Nor does TT Club engage the text of the MCL Policy to argue for a different interpretation. Instead, TT Club contends that the National Union MCL Policy only covers risks associated with **accidents** resulting from the use of "covered autos" as opposed to the risks associated with **negligence in arranging for transportation or delivery** of another carrier. (ECF No. 75 at 14). TT Club, however, cites no case law to support its contention. Additionally, TT Club argues that prior characterizations of the National Union Policy in correspondence between the insurers indicate that National Union admitted the policies do not address the same risk. (ECF No. 64 at 15–16). Thus, in TT Club's view, the policies cover different risks and thus the "Other Insurance" clause National Union claims would render the MCL Policy in excess to the TT Club Policy is inapplicable. (*Id*. at 15–16).

For the purposes of declaring limitations, rights, and obligations under the MCL Policy, this Court need not look beyond the plain language of the MCL Policy. *Johnson v. Am. Fam. Ins.*, 2005-Ohio-1776, ¶ 23 (6th Dist.) (In the context of declaratory judgment finding that "[w]here the policy language is clear and unambiguous, its terms must be applied without engaging in any construction."). Moreover, to determine whether the MCL Policy covers broker liability, this Court need not opine on Greatwide's role as a broker or motor carrier in the underlying accident. This Court finds no limiting language within the relevant policy provision that precludes the MCL Policy coverage from extending to risks associated with arranging for the transportation or delivery of another carrier. Instead, this Court finds that the MCL Policy covers not just liability related to accidents, but it covers any "property" or "bodily" injury damage arising out of an accident ***and***

27

resulting from the **use** of non-owned autos used in connection with Greatwide's business. It is not preclusive that the word accident appears in the policy provision, as the language indicates that the MCL policy would cover accidents that resulted from brokered autos. Accordingly, this Court interprets such plain and broad words to encompass liability related to brokering.

Thus, the tractor-trailer involved in the *Moyer* Lawsuit falls under the broad "covered auto" definition, as it is an auto that Greatwide did not own but used in connection with its business. (*See* ECF No. 1-1 at 123). Given that the policy explicitly covers damage related to the use of "covered autos," which National Union has effectively demonstrated includes autos not owned by Greatwide but used in connection with its business, the National Union MCL Policy covers the liability of Greatwide *if* it were acting as a broker and using a Simbad auto to move the Alton Steel load.

Accordingly, and contrary to TT Club's contention, the National Union MCL Policy covers broker liability in addition to motor carrier liability.

### b) *Coverage Under the National Union CGL Policy*

It is undisputed that the National Union CGL Policy covers Greatwide's broker liability. (ECF No. 65-1 at 12). It is disputed, however, whether National Union's CGL Policy excludes motor carrier liability. (ECF No. 76 at 17). National Union contends that the "Auto Exclusion" in the CGL policy bars coverage if Greatwide were deemed to be a motor carrier because Greatwide would have been "operating" the Alton Steel load. (ECF No. 65-1 at 12). This Court disagrees. In relevant part, the CGL exclusion specifies that it excludes coverage for bodily injury arising from the use of an "auto" owned or **operated** by Greatwide. (*Id.*). Notably, the CGL Policy does not define operate. Under Ohio law, however, to operate means to physically drive the vehicle; thus, even if Greatwide were deemed a motor carrier due to its contractual obligations (*see Diamond*, 649 F. Supp. 3d at 630), Greatwide was not the "operator" of the Alton Steel load, Simbad was.

28

O.R.C. 4511.01(HHH) ("'Operate' means to cause or have caused movement of a vehicle, streetcar, or trackless trolley."); *see also Riffle v. State Auto. Mut. Ins. Co.*, 1979 WL 210072, at *2–3 (8th Dist. Apr. 5, 1979) (finding the defendant did not operate the vehicle where he did not physically drive the vehicle); *see also Tibbs v. Ernst Enterprises, Inc.*, 2009-Ohio-3042, ¶ 25 (2nd Dist.) ("A person is qualified to operate a commercial motor vehicle if he is physically qualified to drive."). As such, the "Auto Exclusion" does not apply here. Accordingly, the *Moyer* lawsuit allegations implicated the CGL Policy under both broker and motor carrier liability.

### c) The Applicability of "Other Insurance" Clauses

Now that this Court has established that both the MCL Policy and the TT Club Policy cover broker liability, it must determine how the policies interact if Greatwide is a broker. Under Ohio law, if two policies cover the same risk, the court should look to "other insurance" clauses to determine the priority of policies. *Great Am. Ins. Co. of New York v. Philadelphia Indem. Ins. Co.*, 2022-Ohio-1160, ¶ 22 (1st Dist.). Further, there are three primary types of "other insurance" clauses that dictate how the policies interact with one another: (1) pro rata clauses; (2) excess clauses; and (3) escape clauses. *See* Young, Bekeny & Mesko, *Ohio Insurance Coverage,* Section 8:5 (2025). At issue in this case are excess and escape clauses.

"An excess clause typically states that the insurance is available only after any other available coverage is exhausted, and an escape clause, as the name implies, states that the insurance does not apply at all if there is other available insurance." *Id.* Here, the Parties dispute the extent to which "other insurance" clauses apply in this case, which types of clauses (excess or escape) are at play, and how the clauses interact if at all. (See ECF Nos. 64 at 21–33; 65-1 at 13–18).

As a general matter under Ohio law, when one policy contains an escape clause and another policy contains an excess clause, the excess clause is given effect over the escape clause. *See State*

*Farm Mut. Auto. Ins. Co. v. Home Indem. Ins. Co.*, 23 Ohio St.2d 45, 47–48 (1970). Alternatively, when two excess clauses are at play, "the two insurers become liable in proportion to the amount of insurance provided by their respective policies." *Buckeye Union Ins. Co. v. State Auto. Mut. Ins. Co.*, 49 Ohio St.2d 213, 218 (1977).

National Union argues that because the National Union Policy and the TT Club Policy cover a shared risk of broker liability, Ohio law instructs that courts look to "other insurance" clauses to determine which policy applies. (ECF No. 65-1 at 13). In National Union's view, the MCL Policy is excess to the TT Club Policy because its "Other Insurance" clause provides "this Coverage Form provides primary insurance for any covered 'auto' you own and **excess insurance** for any covered 'auto' you don't." (ECF Nos. 65-1 at 14; 1-1 at 131–132) (emphasis added). Further, National Union contends that TT Club's "Double Insurance" provision is an escape clause and that Ohio law supports enforcing excess clauses over escape clauses. (ECF No. 65-1 at 15–18).

In TT Club's view, even if the policies provide overlapping risk for broker liability, the TT Club Policy does not cover automobiles or motor carrier liability which prevents the application of the "other insurance" clauses entirely. (ECF No. 64 at 21, 24). TT Club also contends that the MCS-90 Endorsement included in the National Union MCL Policy vitiates the MCL Policy's "Other Insurance" clause. (*Id.* at 22) (citing *Prestige Cas. Co. v. Michigan Mut. Ins. Co.*, 99 F.3d 1340 (6th Cir. 1996)). MCS-90 endorsements are "federally mandated endorsements to motor carrier insurance policies" meant to "ensure that members of the public receive compensation for highway accidents." *Redland Ins. Co. v. Singleton*, 2009 WL 10689370, at *6 (N.D. Ohio June 29, 2009). Finally, TT Club argues in the alternative that its Policy is either excess to the MCL Policy

30

or liable for the *Moyer* lawsuit on an equal shares basis, given that both policies contain excess clauses. (*Id.* at 25).

### (1). National Union's "Other Insurance" Clause

First, this Court must address TT Club's arguments that the National Union MCL Policy's "Other Insurance" clause is inapplicable. (ECF No. 64 at 21). As noted above, the MCL "other insurance" provision states "this Coverage Form provides primary insurance for any covered 'auto' you own and **excess insurance** for any covered 'auto' you don't." (ECF Nos. 65-1 at 14; 1-1 at 131–132) (emphasis added). It is undisputed that the MCL provision is an excess clause. It is disputed, however, whether application of this clause would cause a windfall given the two policies cover an "overlapping risk" of broker liability, but not the risk of motor carrier liability. Under Ohio law, "before [one] policy can ride as excess insurance, the other policy must be made to walk as primary insurance." *State Farm*, 23 Ohio St.2d at 47. Although this Court will not read in restrictions to the MCL Policy's "Other Insurance" clause that contradicts its plain meaning, the TT Club Policy cannot be made to ride as primary coverage for a risk it does not cover. Accordingly, if Greatwide is deemed liable as a motor carrier, the MCL Policy would not be rendered excess as there would be no other primary motor carrier insurance and no reason to look to "other insurance" provisions. Alternatively, if Greatwide is deemed a broker, this Court finds that the MCL excess clause must apply, given the two policies cover the same broker liability risk.

### (2). The Impact of National Union's MCS-90 Endorsement

Next, this Court must determine whether the MCL Policy's MCS-90 Endorsement vitiates its "other insurance" clause. The MCS-90 endorsement provides "no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement . . . shall relieve the company from liability or from the payment of any final judgment within the

31

limits of liability herein described." (ECF No. 1-1, Exhibit B). According to TT Club, the

endorsement makes the MCL Policy primary as a matter of law. (ECF No. 64 at 22–24). Relying

on *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, TT Club contends that the Sixth Circuit construes

such endorsements to negate any clauses that have the effect of limiting liability, including excess

clauses. (ECF No. 64 at 22–24) (citing 99 F.3d at 1348–1349). This Court finds that TT Club's

reliance on *Prestige* is misplaced given that in *Prestige*, the Sixth Circuit applied Michigan law.

*See Redland*, 2009 WL 10689370, at *6 (holding that Sixth Circuit precedent supports that prestige

is only binding on cases applying Michigan law).

In *Redland*, the Northern District of Ohio noted that in diversity cases the relevant state law

should apply to interpret MCS-90 endorsements. There the court reasoned:

> In the instant matter, Ohio law applies. Consequently, Prestige is inapplicable and Ohio law
> will be used to interpret Redland's MCS-90 endorsement. The Ohio Supreme Court holds that
> federal law must be applied when interpreting a MCS-90 endorsement. Lynch v. Yob, 95 Ohio
> St.3d 441, 445, 768 N.E.2d 1158 (2002). In Lynch, the court noted that federal circuit court
> decisions interpreting the endorsements have more persuasive value than state court
> decisions. Id. at 448, 768 N.E.2d 1158.
> The Sixth Circuit has explicitly addressed the issue of whether a MCS-90 endorsement alters
> the priority of insurances. Pillings v. Va. Prop. & Cas., 95 Fed. Appx. 126, 129 (2004).
> In Pillings, the court held that insurance priority is not altered despite the presence on the MCS-
> 90 endorsement of a marked box indicating the insurance is primary. Id. at 129. Furthermore,
> the court is to leave the insurance contract in "full force and effect" when interpreting the
> endorsement language. Id. The Court, therefore, finds that the marked box on Redland's
> endorsement is irrelevant in determining the priority of insurance. Since the Court must give
> effect to limiting language in the policy, Redland's coverage remains excess as a matter of law.

(*Id.*). Accordingly, when it comes to broker liability, the National Union MCL Policy is not

primary as a matter of law because the "Other Insurance" clause here has effect and renders it

excess.

### *(3). TT Club's "Double Insurance" Clause*

Next, this Court must determine whether TT Club's "Double Insurance" clause is an excess clause or an escape clause, and how the "Double Insurance" clause would interact with the MCL Policy's excess clause if Greatwide were deemed a broker. TT Club contends that its "Double Insurance" clause is an excess clause, not an escape clause. (ECF No. 64 at 25). In relevant part, the TT Club "Double Insurance" clause provides: "[i]f we and another insurer insure you for the same risk, we will exclude any claim to the extent that it is recoverable from the other insurer or would be recoverable except for a double insurance exclusion." (ECF No. 65-1 at 2–3). TT Club contends that an escape clause "declares that the insurer is not liable to cover an insured if there is other valid and collectible insurance covering the risk" whereas an excess clause "contained in an other insurance provision purports to make an otherwise primary policy excess insurance should another primary policy cover the loss." (ECF No. 64 at 25) (quoting *Ashcraft v. Grange Mut. Cas. Co.*, 2008-Ohio-1519, ¶ 16 (10th Dist.)).

Accordingly, TT Club attempts to distinguish its policy as an excess clause by arguing that because the "Double Insurance" provision provides TT Club will ***not*** provide coverage "***to the extent that it is recoverable***" from another insurer, as opposed to stating "***if*** there is other valid and collectible insurance[,]" the provision is clearly an excess clause. (*Id.* at 26).

National Union contends that the "Double Insurance" clause is an escape clause as indicated by TT's Club's representations of the same clause in other lawsuits. (ECF No. 65-1 at 16). National Union highlights that in *Travelers Prop. Cas. Co. of Am. v. TT Club Mut. Ins. Ltd*, 2022 WL 988001 (S.D. Ga. 2022), TT Club expressly informed the court that its "'Double Insurance' 'is . . . an escape clause which excludes an insurer's liability for loss where other

33

coverage is available.'" (*Id.* at 16). Thus, National Union argues that "Double Insurance" provision is unenforceable under Ohio law given Ohio law does not enforce escape clauses. (*Id.* at 17).

When interpreting an insurance policy, words and phrases used must be given their natural and commonly accepted meaning. *Clarendon Nat'l Ins. Co. v. Lexington Ins. Co.*, 312 F. Supp. 3d 639, 647 (N.D. Ohio 2018). Here, the parties do not contend ambiguity exists in the wording of the TT Club "Double Insurance" clause; rather, the parties dispute the characterization of the clause. Thus, this Court need not look to extrinsic evidence,[6] but must interpret the language of the clause on its face in light of the definitions of escape and excess clauses as provided by Ohio case law.

Ohio law is clear that "[a]n 'escape clause' declares that the insurer is not liable to cover an insured if there is other valid and collectible insurance covering the risk." *Mitchell v. Motorists Mut. Ins. Co.*, 2005-Ohio-3988, ¶ 25 (citing 15 Couch, Insurance (3d Ed.2004), Section 219:36). While "[a]n 'excess clause' contained in an 'other insurance' provision purports to make an otherwise primary policy excess insurance should another primary policy cover the loss." *Id.*

Most notably, the TT Club "Double Insurance" clause makes no explicit reference to the policy being "excess," unlike Ohio cases finding "other insurance" clauses to be excess.[7] While this Court is unaware of a magic words requirement to establish the existence of an excess clause,

---

[6] TT Club offers the expert testimony of Nigel Cooper to support its argument that its "Double Insurance" clause is an excess clause, not an escape clause. (ECF No. 64 at 27). In TT Club's view, given that the TT Club Policy specifies it is governed by English law, expert testimony may aid the Court in the proper interpretation of the clause. (*Id.* at 28). Notably, however, TT Club does not contend that English law applies to National Union, or to this dispute generally. (*Id.*). Accordingly, TT Club's reliance on Cooper's Report is more akin to citing extrinsic evidence, which this Court will not analyze where the policy language is unambiguous. *Diamond Trans. Logistics, Inc. v. Kroger Co.*, 649 F. Supp. 3d at 620.

[7] This Court examined various Ohio cases that interpreted insurance policies containing excess clauses that explicitly included the word "excess." *See Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.,* 2010-Ohio-5176, ¶ 23 (6th Dist.); *Trinity Universal Ins. Co. v. Gen. Acc. Fire & Life Assur. Corp.*, 138 Ohio St. 488, 489 (1941); *Progressive Direct Ins. Co. v. Motorists Mut. Ins. Co.*, 2011-Ohio-315, ¶ 9 (1st Dist.); *Nationwide Mut. Fire Ins. Co. v. Wood*, 2008-Ohio-4335, ¶ 22 (9th Dist.); *Pierson v. Wheeland*, 2006-Ohio-1316, ¶ 18 (9th Dist.); *Bertsch v. Nationwide Mut. Ins. Co.*, 2003-Ohio-1105, ¶ 16 (5th Dist.).

34

the consistency of the language used to indicate excess clauses in Ohio guides this Court's interpretation. TT Club provides no authority where Ohio courts have found an insurance policy containing language limiting its application "to the extent" that it is recoverable from another insurer, to constitute an escape clause.[8] Nor has this Court identified any such cases. Thus, this Court looks to *Monroe Guar. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 2000 WL 522326 (11th Dist. Mar. 31, 2000) for guidance on how "to the extent" has been interpreted under Ohio law.

In *Monroe*, two insurers, Monroe and Hartford, were implicated due to a lightning strike that caused significant property damage to a construction company's property. *Id.* at 1–2. Both insurers contained "other insurance" excess clauses with nearly identical language. *Id.* at 3. Additionally, the Hartford Policy contained a provision that "expressly excluded lightning as a valid cause of loss **to the extent** that another insurance policy provided coverage for that particular peril." *Id.* at 4. After an unfavorable decision at the trial court level, Monroe appealed the trial court's finding that its policy was primary over Hartford's policy based on its belief that the Hartford lightning exclusion acted as an escape clause which is not enforced over excess clauses. *Id.* (citing *State Farm*, 23 Ohio St.2d at 46–48). The court of appeals reasoned that:

> We recognize that the general rule as promulgated by the Supreme Court in *State Farm* is that an excess clause will be given effect when it conflicts with an escape clause. The scenario in *State Farm,* however, only encompassed one excess clause and one escape clause. In the case at bar, both the Monroe Guaranty and Hartford Steam Boiler policies contained excess clauses wherein the companies attempted to disclaim primary liability when "there is other insurance covering the same loss or damage[.]"… Since lightning was a specified cause of loss in the Monroe Guaranty policy, the lightning exclusion in the Hartford Steam Boiler policy became operative.

---

[8] Case law in other jurisdictions indicate that the phrase "to the extent" is indicative of an escape clause. *See* Seaman and Schulze, *Allocation of Losses in Complex Insurance Coverage Claims*, Section 5:3 (2025) ("If there is 'other insurance' available, the application of an escape clause extinguishes the insurer's liability to the extent of that other insurance.") (citations omitted).

*Id.* at 4.

In sum, the *Monroe* court found *State Farm* to be inapplicable given that there were two excess clauses at play in addition to the Hartford lightning exclusion, which the court did not deny contained escape clause language. As such, the *Monroe* court did not put Monroe's excess clause in competition with Hartford's lightning exclusion, given Hartford also had an excess clause. While the court of appeals did not rule in Monroe's favor, its analysis of the lighting exclusion is instructive. Notably, the court reasoned that the Hartford Policy, which "excluded lightning as a valid cause of loss **to the extent** that another insurance policy provided coverage[,]" was "specifically drafted to exclude lightning as a covered cause of loss when that peril was covered by another insurance policy maintained by Hardrives Paving." *Id.* at 4–5.

Applying  the *Monroe* court's logic, this Court finds that the TT Club clause was drafted in a manner that unequivocally excludes liability when another policy provides coverage. Accordingly, this Court finds that the TT Club "Double Insurance" clause is more akin to an escape clause than it is an excess clause.[9] Given that under Ohio law excess clauses are given effect over escape clauses, this Court finds that the National Union MCL Policy is excess to the TT Club Policy when it comes to broker liability. *State Farm*, 23 Ohio St.2d at 48 ("There being no other 'primary,' in contradt to 'excess,' insurance available to the driver, the [escape] clause is insufficient to prevent liability from attaching to the insurer who designed it.").

---

[9] TT Club also contends that its "Double Insurance" clause and National Union's "Other Insurance" clause are at minimum mutually repugnant, and therefore the parties should be liable on an equal shares basis. (ECF No. 64 at 30–33). Given that this Court has established that the "Double Insurance" clause is in fact an escape, clause and not an excess clause, this Court need not address such arguments or TT Club's related contentions that Pennsylvania law should govern any allocation of damages between conflicting excess clauses. (*Id.*).

***(4). National Union CGL Policy's "Other Insurance" Clause***

Finally, National Union contends that if its CGL Policy applies at all, it also applies on an excess basis as the Policy states the insurance "is **excess** over…[a]ny of the other insurance, whether primary, excess contingent or on any other basis…[i]f the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft to the extent not subject to" the Auto Exclusion. (ECF No. 65-1 at 14) (emphasis added). As to the CGL Policy, this Court finds that given it also undisputedly covers broker liability, it only applies on an excess basis with regard to broker liability.

Since both the National Union MCL Policy (covering up to $2,000,000 per accident) and the CGL Policy (covering up to $1,000,000 per accident) are excess to the TT Club Policy (covering up to $5,000,000 per accident), National Union would be entitled to recover the payment that it contributed to the *Moyer* Settlement from TT Club, *if* Greatwide were deemed a broker. Alternatively, if Greatwide were deemed a motor carrier, National Union would be liable for the settlement.

***3. National Union's Claims for Equitable Subrogation and Indemnification of the Moyer Settlement***

Next this Court will address National Union's claims for recoupment of its settlement contribution. "It is well settled that one secondarily liable, who is forced to pay because of the refusal, or failure after demand, of the one primarily liable to discharge the obligation, has the right of indemnity from the one primarily liable." *Aetna Cas. & Sur. Co. v. Buckeye Union Cas. Co.*, 157 Ohio St. 385, 392 (1952). Further, "'applying the principles of equity and natural justice,' the secondary insurer possesses an equitable right to recover from the primary insurer, as well as a

right to recover by way of subrogation under the policy." *Ins. Co. of N. Am. v. Travelers Ins. Co.*, 118 Ohio App.3d 302, 314 (8th Dist. 1997) (citing *Aetna Cas. & Sur.*, 157 Ohio St. at 393–94).

National Union contends that TT Club was primarily liable for the *Moyer* Settlement, and therefore National Union is entitled to recover its settlement contribution from TT Club. Additionally, National Union contends that TT Club had a primary duty to indemnify Greatwide, whereas National Union had a secondary duty to indemnify Greatwide. TT Club counters that National Union cannot recover its contribution from, nor is it entitled to indemnification for, the *Moyer* Settlement because the policies do not cover the same risk, and alternatively because the "other insurance" clauses in the policies render National Union primary to the TT Club Policy in the event they do cover the same risk. (ECF No 64 at 13–31).

A threshold issue here, however, is that this Court cannot declare which policy was primarily liable where the policies are not identical and Greatwide's role as a motor carrier or a broker was never determined. *See Maxum Indemnity Co.*, 2012-Ohio-2115, ¶ 28 ("[U]nder both insurers' 'other insurance' clauses, a determination of ultimate liability coverage must be made in order to determine primary and excess of coverage, since, if Selective had no ultimate liability to cover Maze's claim, it would be neither a primary nor an excess insurer under either policy's 'other insurance' provisions."). As discussed, such a determination directly impacts which insurer is primarily liable. *See* Section III.B.1, *supra*. Accordingly, this Court cannot grant summary judgment for equitable subrogation or equitable indemnification where there is a genuine issue of material fact as to Greatwide's identity as a broker or motor carrier.

### 4. *TT Club's First Amended Counterclaim for Reimbursement of Defense Costs*

In addition to its cross motion for summary judgment on National Union's claims, TT Club moved for summary judgment on Count I of its First Amended Complaint. TT Club seeks

reimbursement of 2/3 of the defense costs it incurred in defending Greatwide via equitable contribution, subrogation, or indemnification from National Union under both the MCL and CGL policies. (ECF No. 29 at 21–22). Under Ohio law, "[a]n insurer has an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy[,]" which is distinct from its duty to indemnify. *Sharonville v. Am. Emp. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 13; *see also Lexington Ins. Co. v. DunnWell, LLC*, 2016-Ohio-5311, ¶ 44 (9th Dist.) (opining that the duty to defend is greater than the duty to indemnify). Thus, once an insurers policy obligations are triggered, the insurer is required to defend the insured on all claims regardless of their applicability to the policy. *Sharonville*, 2006-Ohio-2180, ¶ 13. Further, "[t]hese principles apply equally to situations where the allegations set forth in the complaint could arguably be covered by two insurers." *Maxum Indem. Co.*, 2012-Ohio-2115, ¶ 16 (citing *Ins. Co. of N. Am.*, 118 Ohio App.3d at 314). "However, once the insurer is able to establish that there is no set of facts that would bring the allegations of the complaint within coverage of its policy, its duty to defend is extinguished." *Id.* ¶ 17.

Here, TT Club contends that National Union breached its duty to defend Greatwide under both the MCL and the CGL Policies. (ECF No. 64 at 34). Accordingly, TT Club seeks reimbursement for two-thirds of its defense costs related to defending Greatwide (*Id.*).

### a) *Duty to Defend Under the MCL Policy*

First, TT Club argues that because the underlying allegations in the *Moyer* Lawsuit involved an auto accident, National Union's obligations to defend were triggered under the MCL Policy. In TT Club's view, National Union's failure to defend Greatwide entitles TT Club to reimbursement. (*Id.*). TT Club further argues that the National Union "Other Insurance" clause is inapplicable for the same reasons cited above, *see* Section III.B.2.c, *supra*, in addition to the fact

that the clause does not specify that the policy is specifically excess to the duty to defend. (ECF No. 64 at 36). TT Club also highlights that National Union's intent can be gleaned by looking to the CGL policy's "Other Insurance" clause, which explicitly states that National Union will have no duty to defend when it is excess. (*Id.* at 38).

In response, National Union contends that its "Other Insurance" clause voids its obligation to reimburse TT Club, given its Policy contains an excess clause, whereas TT Club's Policy contains an escape clause. (ECF No. 74 at 21).

This Court notes that National Union fails to address TT Club's argument that for the "other insurance" clause to apply, it must specifically reference the duty to defend. (*Id.*). National Union cites to *Great Am. Ins. Co..*, 2022-Ohio-1160, ¶ 26 as proof that Ohio law enforces "other insurance" clauses in relation to the duty to defend. (*Id.*). National Union, however, mischaracterizes TT Club's argument and the case law on which it relies. TT Club does not assert that "other insurance" clauses do not apply to the duty to defend, but that such clauses must explicitly state that the provision applies to the duty to defend. (ECF No. 64 at 37).

In *Great American*, the court enforced an "other insurance" clause that rendered an insurers policy excess with regard to the duty to defend where the policy explicitly stated that it applied to the duty to defend. *Great American*, 2022-Ohio-1160, ¶ 26 ("[T]he 'Other Insurance' clause in Philadelphia's policy specifically refers to when Philadelphia's policy regarding its duty to defend is 'excess.' The clause states that even if Philadelphia ultimately has a duty to 'pay a claim as a result of loss,' the '[p]olicy shall be excess over any other policy under which another insurer has a duty to defend a claim.' The meaning of this clause is that if another insurance company has a duty to defend even the claims that Philadelphia may be obligated to indemnify, then the Philadelphia policy is excess with regard to the duty to defend."). Thus, while the *Great American*

40

court does provide support that "other insurance" clauses should be considered in assessing the duty to defend, *Great American* is factually distinct from the case sub judice given that the "other insurance" clause involved there was narrowly tailored with regard to the duty to defend. *Id.*; *see also IMG Worldwide, Inc. v. Westchester Fire Ins. Co.*, 572 F. App'x 402, 410 (6th Cir. 2014) (analyzing and applying an "other insurance" clause to the duty to defend where the clause specifically referenced the duty to defend).

As established above, the MCL Policy was implicated in the *Moyer* lawsuit based on allegations related to both broker and motor carrier liability. (*See* III.B.2.a, *supra*). Given that the National Union MCL Policy's "Other Insurance" clause does not specifically reference that the policy is excess in relation to the duty to defend, this Court finds that the excess clause was not clearly drafted in a way that demonstrates intent to apply to the duty to defend. Further, National Union has not established that there is no set of facts that would bring the allegations of the complaint within coverage of its policy. *Maxum*, 2012-Ohio-2115, ¶ 17. As such, absent proof that its duty to defend was extinguished, National Union was obligated to defend Greatwide based on the Moyer allegations alone. *Id.* ¶¶ 16–17. Accordingly, this Court finds that National Union breached its initial duty to defend Greatwide.

In terms of reimbursement, however, this Court finds that TT Club is not entitled to reimbursement of the defense costs incurred to defend Greatwide at this stage. Under Ohio law, an insurer may seek indemnification where there was improper denial of a defense by a primary insurer. *Ins. Co. of N. Am.*, 118 Ohio App.3d at 314; *Aetna Cas. & Sur. Co.*, 157 Ohio St. at 392; *IMG Worldwide, Inc. v. Great Divide Ins. Co.*, 704 F. App'x 562, 567 (6th Cir. 2017). Given there is a genuine issue of material fact as to whether Greatwide acted a motor carrier or a broker, this Court cannot make a determination regarding which insurer was primary or excess to establish

41

who was required to pay Greatwide's defense costs. *Maxum*, 2012-Ohio-2115, ¶¶ 24–28. As such, TT Club's First Amended Counterclaim for Reimbursement of Defense Costs Under the National Union MCL Policy is **DENIED** without prejudice.

### b) Duty to Defend Under the CGL Policy

TT Club also contends that National Union breached its duty to defend under the CGL Policy given the allegations of the *Moyer* Lawsuit fell under the policy, National Union had notice of the allegations due to its MCL Policy, and accordingly, should have evaluated duties under the CGL Policy. (ECF No. 64 at 38–40). Additionally, TT Club contends the "Other Insurance" clause in the CGL Policy does not apply as the policies do not cover the same risk. (*Id.*). Moreover, TT Club argues that the CGL Auto Exclusion does not preclude National Union's duty to defend. (*Id.* at 39). Alternatively, National Union contends that it had no duty to evaluate its duties under the CGL Policy, and even if the CGL Policy applies, its "Other Insurance" clause precludes its duty to defend. (ECF No. 74 at 25).

National Union's CGL exclusion specifies that it excludes coverage for bodily injury arising from the use of an "auto" owned or **operated** by Greatwide. (ECF No. 65-1 at 24). Under Ohio law, to operate means to physically drive the vehicle. *See Riffle*, 1979 WL 210072, at *2–3. Thus, even if Greatwide were deemed a motor carrier, Greatwide was not the "operator" of the Alton Steel load, Simbad was. As such, the exclusion does not apply here. Further, it is undisputed that both the CGL Policy and the TT Club Policy both cover the same risk of broker liability. Accordingly, the *Moyer* lawsuit allegations implicated the CGL Policy under both broker and motor carrier liability.

TT Club, however, has already conceded that the CGL Policy's "Other Insurance" clause specifically references that it is excess regarding its duty to defend. (ECF No. 64 at 38).

42

Accordingly, this Court finds that where two policies cover the same risk, and one contains an excess clause specifically referencing the duty to defend, the duty to defend is abolished on behalf of the insurer with the excess clause. *See Great American*, 2022-Ohio-1160, ¶ 26. As such, National Union had no duty to defend Greatwide under the CGL Policy.

For the reasons stated above, TT Club's Motion for Summary Judgment as to its First Amended Counterclaim for Reimbursement of Defense Costs Under the National Union CGL Policy (ECF No. 63) is **DENIED with prejudice**.

### C. National Union's Motion to Strike

National Union filed a Motion to Strike or Exclude TT Club's Expert Reports of Nigel Cooper and Jeffrey Stempel. (ECF No. 73). National Union also moves to strike portions of an email conversation between Mathhew Bates of Greatwide and a representative of Lexington Insurance Company. (*Id.*). Considering this Court did not rely on the expert reports or the email in its ruling on the summary judgment motions above, the Motion is **DENIED as moot**.[10]

### D. USIC's Motion to Certify

#### 1. State-Law Question Certification Standard of Review

Federal courts have the discretion to decide whether to certify questions to the state supreme court. *Tri Cnty. Wholesale Distributors, Inc. v. Labatt USA Operating Co.*, 2014 WL 32307, at *2 (S.D. Ohio Jan. 6, 2014) (Marbley, J.) (citing *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009)). The Ohio Supreme Court Rules of Practice provide:

> The Supreme Court may answer a question of law certified to it by a court of the United States. This rule is invoked if the certifying court, in a proceeding before it, issues a certification order finding there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court.

---

[10] *See Hamilton Cnty. Emergency Commc'ns Dist. v. Level 3 Commc'ns, LLC*, 845 F. App'x 376, 389–390 (6th Cir. 2021) (finding that the district court did not err in denying motion to strike as moot where it did not rely on the report).

Ohio S. Ct. Prac. R. 9.01(A).

Simple "difficulty in ascertaining local law provides an insufficient basis for certification." *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2 (quoting *Duryee v. U.S. Dep't of the Treasury*, 6 F. Supp. 2d 700, 704 (S.D. Ohio 1995)). Because "certification to the Supreme Court of Ohio . . . entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court," *Drown v. Wells Fargo Bank, NA*, 2010 WL 4939963, at *2 (S.D. Ohio Nov. 30, 2010) (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 394 (1974)) (internal quotations omitted), certification is inappropriate when "a district court . . . believes that it can resolve an issue of state law with available research materials already at hand, and makes the effort to do so." *Id.* (quoting *Lehman Bros*, 416 U.S. at 395).

To decide in favor of certification, then, federal courts must find that "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court." Ohio S. Ct. Prac. R. 9.01(A). Even if a federal court answers both inquiries in the affirmative, it must also consider if it can resolve the issue of state law with the materials at hand. *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2 (quoting *Drown,* 2010 WL 4939963, at *2). Only if a court finds that there is a genuine dearth of guidance from state court precedent, so much so that it would be extremely difficult to examine properly the questions presented, should it elect to certify a question to the Ohio Supreme Court. *Id.*

### 2. *State-Law Question Certification Law and Analysis*

USIC's Motion to Certify proposed the following question for certification to the Ohio Supreme Court:

44

> Is a prejudice analysis required to determine whether a liability insurer must indemnify its insured for a settlement where: (1) the insurer did not have notice or a tender of the lawsuit or claim against the insured until after the settlement; and (2) the insurer's policy includes the following standard policy language: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent."

(ECF No. 88 at i).

As set fortph above, to certify a question to the Ohio Supreme Court, this Court must be satisfied that: (1) the question involves Ohio law that may be outcome-determinative of the proceeding; and (2) there is no controlling Ohio Supreme Court precedent. Ohio S. Ct. Prac. R. 9.01(A); *Stevens v. City of Columbus*, 2020 WL 7021422, at *2 (S.D. Ohio Nov. 30, 2020). This Court maintains the discretion to decline certification even if the movant satisfies both prongs. *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2.

USIC seeks determination of whether it needed to establish that it was prejudiced by TT Club and/or Greatwide' s failure to notify USIC of the *Moyer* Lawsuit and Settlement given that its Policy contained a voluntary-payment provision. (ECF No. 88 at i). As to the first prong, USIC asserts that if it is determined that a prejudice analysis was not required, then TT Club's claims against USIC fail based on the voluntary payment provision alone. (*Id.* at 2). TT Club does not oppose this contention. This Court thus finds that the first prong is met. As to the second prong, however, the parties disagree as to whether there is controlling Ohio Supreme Court precedent that speaks directly to the question USIC seeks to certify.

According to USIC, there is no controlling precedent from the Ohio Supreme Court addressing the specific issue of whether a prejudice analysis is required when the policy involved contains a voluntary payment provision. (ECF No. 88 at 3).

TT Club contends that the Ohio Supreme Court has already definitively answered the USIC's question in *Ferrando v. Auto-Owners Mut. Ins. Co.*, 781 N.E.2d 927, 947 (Ohio 2002) as

45

indicated by the Sixth Circuit's decision in *ACE Am. Ins. Co. v. Zurich Am. Ins. Co.*, 2024 WL 945246 (6th Cir. Mar. 5, 2024). (ECF No. 90 at 3). In *ACE American*, Ace sought equitable contribution from two other insurers, Zurich and Discover, related to a lawsuit that Ace had failed to notify Zurich and Discover of until four years after its initiation and Ace had incurred nearly $5 million in defense fees. *ACE American*, 2024 WL 945246, at *1. The district court originally held that Zurich and Discover were not required to demonstrate prejudice given they had not been notified of the underlying litigation. *ACE Am. Ins. Co. v. Zurich Am. Ins. Co.*, 2022 WL 16534826, at *8 (S.D. Ohio Oct. 28, 2022). The Sixth Circuit overturned the district court's decision, finding that Ohio law requires insurers to demonstrate that they were prejudiced by untimely notice of underlying litigation so as to be released from its coverage obligations. *ACE Am.*, 2024 WL 945246, at *4–5. ("[T]he weight of the relevant data shows *Ferrando's* rule is universal. For these reasons, the district court erred in declining to conduct the prejudice inquiry mandated by *Ferrando*"). Thus, on remand, the district court conducted the *Ferrando* prejudice inquiry and extended it to a voluntary payment provision like the one at issue in this case. *ACE Am. Ins. Co. v. Zurich Am. Ins. Co.*, 765 F. Supp. 3d 705, 721–723 (S.D. Ohio 2025).

While this Court acknowledges the specific question posed by USIC has not been posed to the Ohio Supreme Court directly, this Court finds the Ohio Supreme Court's decision in *Ferrando* renders certification unnecessary. *Ferrando* instructs that as a general matter, to avoid obligation, insurers who received delayed notice of claims must demonstrate that they were prejudiced by the lack of notice. *Ace Am.*, 2024 WL 945246, at *4. Thus, the Ohio Supreme Court is unlikely to rule differently simply because an insurer has a voluntary payment provision, given that *Ferrando* expressly considered the public policy implications involved in allowing an insurer to escape liability based on procedural reasons. *Id.* Further, this Court finds that the legal inquiry into

46

whether a prejudice analysis is required in light of a voluntary payment provision is readily resolvable given the available materials. As indicated by TT Club, precedent on this very issue already exists in the Southern District. (ECF No. 90 at 3–6); *Ace Am.*, 765 F. Supp. 3d 705 at 717 ("Ultimately, this Court concludes that, following *Ferrando*, the Ohio Supreme Court likely would apply a prejudice requirement for violations of voluntary payment provisions.").

Accordingly, this Court declines to exercise its discretion to certify USIC's question to the Supreme Court of Ohio. As such, USIC's Motion to Certify (ECF No. 88) is **DENIED**.

### E.  USIC's Motion for Summary Judgment

In its Motion for Summary Judgment, USIC argues that TT Club is not entitled to equitable contribution, subrogation, or indemnification from USIC because: (1) TT Club cannot reallocate the amounts paid in the *Moyer* Settlement in a manner that allows recovery from USIC; (2) the USIC Policy is excess to all other relevant policies; (3) the USIC policy excludes coverage for the *Moyer* accident; and (4) USIC is not obligated to provide equitable contribution to the *Moyer* Settlement as it was never notified of the Moyer Lawsuit or Settlement prior to being joined in this case. (ECF No. 60 at 1).

USIC highlights that the *Moyer* Lawsuit did not determine whether Greatwide was liable as a motor carrier or as a broker, as previously discussed in Section III.B.1, *supra*. (ECF No. 60 at 9). Specifically, USIC argues that Greatwide's liabilities were never separated or allocated, and instead TT Club and National Union entered a settlement on a 50-50 basis without deciding allocation of liability under the relevant Policies. (*Id.*). USIC therefore argues that because Greatwide and TT Club failed to allocate liability in the underlying action, it may not reallocate liability after the fact. (*Id.* at 11).

Next USIC contends that it is excess to all other policies and expressly excess to the National Union CGL Policy. (*Id.*). USIC thus argues that TT Club cannot seek contribution from USIC without demonstration that it never owed anything for the Settlement but cannot do so due to its failure to allocate in the *Moyer* Lawsuit. (*Id.* at 12). USIC also contends that it is not obligated to provide equitable contribution as both its Policy and the National Union CGL Policy expressly preclude coverage for automobile liability. (*Id.* at 13).

Finally, USIC argues that it is not responsible for costs incurred without its notice or consent given the express voluntary payment provision in its policy, as well as the fourteen days loss notice policy.[11] (*Id.* at 14).

TT Club counters with several points. First, it argues that is unnecessary that the allocation be determined in the underlying lawsuit, as the insurer may submit evidence that would create a reasonable basis of allocation to this Court for segregation of the covered damages. (ECF No. 76 at 8). Second, TT Club contends that the National Union CGL Policy is not in excess to the TT Club Policy, and accordingly the USIC Policy cannot be in excess to the TT Policy. (*Id.* at 10). Relying on *Buckeye Union* and *Monroe Guaranty*, TT Club argues that Ohio law only looks to other insurance clauses to resolve priority coverage issues "where two insurance polices **cover the same risk**." (*Id.*) (emphasis added). TT Club contends, that in this case, although both the CGL Policy and the TT Club Policy were implicated by the same loss at issue in *Moyer*, they do not cover the same risk. (*Id.* at 13). TT Club asserts that its Policy does not take priority over the National Union CGL Policy or USIC's Policy, which is expressly in excess to the CGL Policy.

---

[11] USIC's Voluntary Payment Provision provides that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (ECF No. 29-1 at 12).

48

(*Id.* at 16). Moreover, in TT Club's view, once the CGL Policy was exhausted, USIC was obligated to contribute to the Settlement under a theory of vertical exhaustion. (*Id.*).

Third, TT Club contests that the auto exclusion clauses in USIC's Policy are applicable because the "exclusions [only] apply to bodily injury 'arising out of the ownership, maintenance, use or entrustment to others' of any 'auto' 'owned or operated by or rented or loaned to any insured.'" (*Id.* at 17). Thus, TT Club contends the exclusion does not apply as Simbad—not Greatwide—owned and operated the auto involved in the accident, and further, there was no finding that Greatwide was liable as a motor carrier to establish that it "used" the auto. (*Id.*). Finally, TT Club contends that in order to succeed on its lack of notice arguments, USIC needed to demonstrate prejudice as a result of Greatwide's breach but ultimately failed to do so. (*Id.* at 18–20).

First, this Court will address USIC's reallocation argument, where USIC contends that because liability was not allocated in the underlying *Moyer* Lawsuit, the opportunity to do so has expired. In support of its contention, USIC relies primarily on *Howell v. Richardson*, 544 N.E.2d 878 (1989). In *Howell*, the Ohio Supreme Court found that where a determination of negligence as to a tortfeasor's liability was found in an underlying suit, an insurer cannot relitigate the determination in a subsequent action. *Id.* at 368. USIC additionally cites a string of cases in which Ohio courts rely on *Howell* to establish that insurers who fail to intervene are barred from relitigating liability. (ECF No. 78 at 6). As TT Club indicates, however, the *Moyer* Lawsuit settled prior to any finding of liability, and accordingly there is no underlying determination to relitigate in the instant litigation. Thus, *Howell* does not support USIC's arguments here. Further, under USIC's reallocation argument, an insurer would never have any incentive to settle without a

49

determination of liability out of fear that it would never be able to recover contribution from other insures later. Accordingly, USIC's allocation argument fails.

Despite such, TT Club cannot establish it is entitled to indemnification from USIC, or any other party, where Greatwide's role in the underlying accident has not been determined. As USIC emphasizes (ECF Nos. 60 at 12; 76 at 6–10), TT Club must still bridge the evidentiary gap: it must show a concrete basis on this record to segregate broker-based exposure from motor-carrier-based exposure, rather than asking the Court to *hypothesize* how a trier of fact "would have" allocated liability in the underlying case. *Bank One, N.A. v. Echo Acceptance Corp.*, 522 F. Supp. 2d 959, 971 (S.D. Ohio 2007). As mentioned above, there are genuine issues of material fact as to Greatwide's status, and therefore, this Court cannot determine rights of indemnification. *See* Section III.B.1, *supra*.

Next, this Court will address USIC's voluntary payment provision and lack of notice arguments. As discussed in Section III.D, *supra*, a prejudice analysis is required to establish coverage has been forfeited despite a policy's voluntary payment provision and a lack of notice of the relevant claims to an insurer. *See ACE*, 765 F. Supp. 3d at 717–18. Under *Ferrando*, the Court must conduct a two-prong analysis: (1) first, the court must determine whether the insurer did not receive reasonable notice that resulted in a breach of contract; (2) then, the court must determine whether the breach resulted in prejudice such that the coverage must be forfeited. *Westfield Ins. Co. v. Russo*, 2005-Ohio-5942, ¶ 14 (9th Dist.) (citing *Ferrando v. Auto-Owners Mutual Ins. Co.*, 781 N.E.2d at 947)).

Here, the parties do not dispute that there was a delay in notice. Thus, this Court looks only to prong two of the analysis. USIC contends that it was prejudiced by not being afforded the opportunity to be involved in the *Moyer* Settlement when allocation of the "mixed" damages was

50

still possible. (ECF No. 60 at 18). TT Club contends the settlement was for a reasonable amount given the risk that Greatwide would be deemed a motor carrier, as indicated by the Wescoe Expert Report. (ECF No. 76 at 20). Additionally, TT Club contends that USIC's presence at an earlier stage would not have impacted the outcome. (*Id.*).

Given USIC was not given the opportunity to participate in the settlement or negotiate liability, USIC suffered "plain" prejudice from the delayed notice. In *Canton Drop Forge*, the Sixth Circuit ruled that there was "plain prejudice" where "[the insured's] delay prevented [the insurer] from having any involvement in negotiating the liability for which it later handed [the insurer] the bill." *Canton Drop Forge, Inc. v. Travelers Cas. & Sur. Co.*, 2021 WL 5895789, at *2 (6th Cir. Dec. 14, 2021). The Sixth Circuit further specified, that "[the insured's] arguments that [the insurer] would have done nothing to reduce liability or cleanup costs [were] speculative and fail[ed] to show a lack of prejudice" *Id.* Similarly, here, TT Club's arguments that USIC's presence at settlement would not have made a difference are merely speculative. As such, USIC is within its right to deny coverage under its Policy given the unreasonable notice given for the underlying *Moyer* Lawsuit and Settlement. USIC's Motion for Summary Judgment (ECF No. 60) is **GRANTED**.

## IV.    CONCLUSION

For the following reasons, this Court **GRANTS** USIC's Motion for Summary Judgment (ECF No. 60). Additionally, National Union's Motion for Summary Judgment (ECF No. 65) is **DENIED**. TT Club's First Amended Counterclaim for Reimbursement of Defense Costs as to the

52

MCL Policy is **DENIED without prejudice** and **DENIED with prejudice** as to the CGL Policy

(ECF No. 63). National Union's Motion to Strike (ECF No. 73) is **DENIED as moot**.

      **IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: March 19, 2026**